UNITED STATES DISTRICT COURT
DISTRICT OF OREGON

INNOVATION LAW LAB,

      Plaintiff,

    v.

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT,

      Defendant.

Case No. 3:25-cv-00066-AN

**SUPPLEMENTAL DECLARATION OF FERNANDO PINEIRO**

I, Fernando Pineiro, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am the FOIA Director of the U.S. Immigration and Customs Enforcement ("ICE"). I have held this position since August 14, 2022, and I am the ICE official immediately responsible for supervising ICE responses to requests for records under the Freedom of Information Act, 5 U.S.C § 552 (the FOIA), the Privacy Act, 5 U.S.C. § 552a (the Privacy Act), and other applicable records access statutes and regulations. Prior to this position, I was the Deputy FOIA Officer of the ICE FOIA Office from December 29, 2013, to August 13, 2022, and prior to that, I was the FOIA Officer for three years at the Office for Civil Rights and Civil Liberties at the U.S. Department of Homeland Security.

2. As the FOIA Director, my official duties and responsibilities include the general management, oversight, and supervision of the ICE FOIA Office regarding the processing of FOIA, 5 U.S.C. § 552, and Privacy Act, 5 U.S.C. § 552a, requests received at ICE. In connection with my official duties and responsibilities, I am familiar with ICE's procedures for responding to requests for information pursuant to the FOIA and the Privacy Act and the handling of Plaintiff's FOIA requests that are the subject of this litigation.

3.  The statements contained in this declaration are based upon my personal knowledge, my review of documents kept by ICE in the ordinary course of business, and information provided to me by other ICE employees in the course of my official duties.

4.  I previously submitted a declaration in this matter describing how ICE received and processed the FOIA requests at issue in this litigation, including the steps taken to search for records responsive to those requests, ICE's proactive disclosure practices, and the basis for withholding portions of the IHSC Discharge and Transfer Guide under FOIA Exemption 7(E).

5.  I submit this supplemental declaration to address Plaintiff's challenges raised in their Motion for Partial Summary Judgment and Opposition to Defendant's Motion for Partial Summary Judgment concerning the reasonableness of ICE's searches, ICE's proactive disclosure obligations under 5 U.S.C. § 552(a)(2), and ICE's withholding and segregability determinations relating to the document referring to in Plaintiff's motion as "Discharge and Transfers." I incorporate by reference my previous declaration, which was filed on January 17, 2026.

6.  First, Plaintiff claims ICE failed to conduct a reasonable search for all responsive records. Second, Plaintiff argues ICE failed to proactively disclose responsive records. Third, Plaintiff asserts ICE improperly withheld responsive information pursuant to FOIA Exemption (b)(7)(E). Fourth, Plaintiff claims ICE failed to make a timely determination on their request. Fifth, Plaintiff contends ICE improperly denied their request for Expedited Processing.

### CLAIM ONE – REASONABLENESS OF ICE'S SEARCH

7.  Plaintiff, in their Motion for Partial Summary Judgment and Opposition to Defendant's Motion for Partial Summary Judgment alleges ICE: (1) unreasonably misconstrued and limited the scope of the request; (2) failed to uncover responsive records; and (3) failed to identify all reasonable custodians and locations; and did not use reasonable search terms.

**ICE REASONABLY INTERPRETED THE SCOPE OF PLAINTIFF'S REQUEST**

8.  Plaintiff's first FOIA request sought operative versions of manuals, memoranda, intake forms, and related guidance concerning initial booking, initial placement, and subsequent transfer of individual in ICE custody, utilized nationally and in the El Paso Field Office's Area of Responsibility (AOR). Pineiro Decl. at ¶ 11.

9.  Plaintiff's second FOIA request sought directives, guidelines, procedures, and protocols issued to or by ICE in relation to the placement and transfer of individuals in ICE custody, including—but not limited to—directives concerning high-profile arrests, transfers to southern states, and transfers to Migrant Operations Center ("MOC") as the U.S. Naval Station in Guantanamo Bay.

10. As previously detailed in ICE's declaration, the ICE FOIA Office determined that the Second FOIA Request concerned the same operational subject matter as the First FOIA Request – namely placement in, and transfer of, detainees in ICE custody – and that the examples identified in the Second Request were encompassed within the broader placement-and-transfer guidance already under review.  Plaintiff's assertion that ICE restricted the search for the second FOIA request to the illustrative examples is misplaced, because the searches for the first FOIA request would have included all other national and regional policies regarding placement in, and transfer of, detainees in ICE custody, to include, inextricably, initial booking/placement or subsequent transfer and without distinguishing between high profile arrests and others (meaning, the search would have encompassed both).  ICE interpreted Plaintiff's requests broadly to ensure all potentially responsive records were identified.  The searches were not limited to the illustrative examples but encompassed all national and regional guidance related to placement and transfer, consistent with the subject matter of both requests.

11. Both requests concerned the same operational subject matter: how individuals are placed and later transferred while in ICE custody. ICE therefore directed its searches to the offices most likely to maintain operative placement-and-transfer guidance generally and then conducted targeted follow-up review concerning the specific examples identified in the second FOIA request.

12. Plaintiff requested issued policies, directives, manuals, intake forms, and operative guidance. ICE therefore focused its searches on the offices and repositories where such records would ordinarily be maintained, as explained in more detail below.

13. Moreover, in their Motion, Plaintiff misstates the time range of the searches conducted for the first FOIA request. Plaintiff incorrectly asserts that the searches performed under the first request cannot be used to fulfill the second request. While the first FOIA request sought records "as of May 2, 2024," the searches for first FOIA request extended until June 16, 2025. Therefore the searches performed under the First FOIA encompass both the "as of May 2, 2024," and "from May 2, 2024 through the date of the fulfillment of the request" time ranges sought by Plaintiff. (Plaintiff motion at 20-21) ICE's searches were comprehensive, covering both the date specified in the first request and the ongoing period specified in the second request. No responsive records were excluded based on date.

14. The first FOIA request sought operative versions of manuals, memoranda, trainings, and intake forms concerning placement and transfer decisions "as of" the request date. The second FOIA request sought directives, guidelines, procedures, and protocols concerning placement and transfer decisions from May 2, 2024, through the date of fulfillment.

15. In identifying responsive records, ICE searched for the versions of policies and guidance that were current and in effect when the searches were completed, rather than superseded drafts, retired guidance, or obsolete versions no longer governing detention operations.

16. The first and second FOIA request were processed during the same period. The searches conducted for the first FOIA request, completed as of June 16, 2025, were not restricted to a single date and covered the full time range identified in the second FOIA request.

17. Because the second FOIA request concerned the same placement-and-transfer guidance already under review, ICE determined that it did not require a separate historical search for a distinct body of records. The examples identified in the Second Request were treated as applications of the same broader operational guidance rather than a separate universe of historical policies.

18. ICE therefore searched for the "operative" versions of records governing detention placement and transfer decisions, rather than superseded versions no longer in use.

## THE LIMITED RECORDS IDENTIFIED BY PLAINTIFF FAIL TO MEET THE THRESHOLD FOR A POSITIVE INDICIA OF OVERLOOKED RECORDS

### ICE IDENTIFIED ALL REASONABLE CUSTODIANS AND LOCATIONS

*ERO Was the Logical Starting Point*

19. The first FOIA request sought manuals, memoranda, intake forms, and guidance concerning where individuals are initially booked, detained, placed, and subsequently transferred while in ICE custody.

20. Those functions fall within Enforcement and Removal Operations ("ERO"), the ICE directorate responsible for detention operations and field implementation of custody decisions.

21. Within ERO, Field Operations oversees detention placement and transfer decisions across field offices. Custody Management addresses detention logistics, facility coordination, and operational placement support. Removal Division coordinates transportation and movement associated with removals and transfers. ICE Health Services Corps ("IHSC") addresses medical and mental-health considerations affecting detention placement and housing decisions.

22. Because Plaintiff sought records concerning placement and transfer decisions, ERO was the logical component to task.

*Custody Management, Field Operations, Removal, and IHSC Were Specifically Tasked*

23. Based on the scope of the first FOIA request, ICE determined that responsive records would most likely be maintained within Custody Management and Field Operations.

24. ICE selected custodians based on their access to relevant records and operational knowledge, not based on job titles alone.

25. The Acting Deputy Assistant Director for Custody Management searched his desktop, hard drive, and share drive and, based on that review, recommended additional searches by Field Operations and IHSC.

26. Field Operations then conducted searches at headquarters, regional, and field levels, including review by the Unit Chiefs overseeing ERO's Eastern and Western Operations

Divisions. Because the first FOIA request specifically referenced El Paso, a separate search was also conducted there.

27. ICE also tasked the Removal Division. The Acting Chief of Staff of the Removal Division searched for records concerning placement guidance, transfers and intake forms because any document in the nature of guidance or similar directive would have originated from the Chief of Staff Office and was the most likely location should any responsive documents exist.

28. These were the offices most closely associated with intake, placement, transfer, and movement decisions.

*ORAP's Inclusion for Centrally Maintained Policy Guidance*

29. The first FOIA request primarily sought operative manuals, memoranda, trainings, intake forms, and field guidance concerning initial placement and subsequent transfer decisions. Because those records concern day-to-day detention operations, ICE first tasked ERO, the component responsible for detention operations, field implementation, and custody management.

30. Because the second FOIA request specifically sought directives, guidelines, procedures, and protocols and referenced Guantanamo-related transfers, GMOC, and high-profile arrests, ICE identified the Office of Regulatory Affairs and Policy ("ORAP") as reasonably likely to maintain any separate centrally maintained policy memoranda or headquarters directives beyond the operational records already being reviewed through ERO.

31. ORAP is the headquarters office responsible for strategic policy development, regulatory coordination, and formal agency-wide directives, and it coordinates the creation, review, and dissemination of internal policy documents.

32. ORAP was not tasked to search the field-level operational records, case-specific transfer events, or local implementation materials, which were addressed through ERO and the relevant field offices. Its role was to determine whether separate centrally maintained policy guidance existed concerning the broader placement-and-transfer subject matter identified by Plaintiff.

6

33. Using the terms "GMOC," "Guantanamo," and "high-profile," the ORAP analyst searched for records specifically tied to the examples identified in the Second FOIA Request and to determine whether additional headquarters guidance existed beyond the records already identified.

34. As detailed in ICE's declaration, agency counsel also inquired about the existence of additional placement-and-transfer guidance beyond the records located by ERO, and ORAP confirmed that no such additional guidance existed. Pineiro Decl. at ¶ 73.

35. ORAP's review therefore functioned as a supplemental headquarters policy check rather than as a substitute for the operational searches conducted through ERO.

*The Guantanamo MOU Does Not Establish the Existence of Additional ICE Placement Directives*

36. Plaintiff also relies on the Guantanamo MOU as support for the claim that ICE withheld unpublished policy directives.

37. The Guantanamo MOU is not an ICE-issued detention placement directive. It is a DHS-level agreement concerning broader interagency coordination, not an ICE directive governing day-to-day detention placement decisions.

38. Its existence does not establish that ICE maintained separate Guantanamo-specific placement policy and or standalone ERO directives under that title.

39. To address Plaintiff's Guantanamo-related examples, ICE tasked ORAP to determine whether additional centrally maintained policy guidance existed beyond the broader placement-and-transfer guidance already identified through ERO.

40. That review did not identify separate Guantanamo-specific or high-profile-arrests directives distinct from the broader detention and transfer guidance already maintained by ICE.

*Miami Field Office Determined It Did Not Have Records Responsive to the Second FOIA Request*

41. Plaintiff's second FOIA request specifically references high-profile arrests, southern facilities, and Guantanamo-related transfers, ERO Field Operations also tasked the Miami Field Office based on its Area of Responsibility.

42. The Assistant Field Office Director ("AFOD") reviewed the second FOIA request and, based on his knowledge and expertise at the time of the tasking, determined that he did not have records responsive to that request.

43. The Miami AFOD therefore did not identify separate responsive records in response to the Second FOIA request.

*The Selection of Custodians*

44. Plaintiff Challenges the use of an AFOD rather than a Field Office Director (FOD), and an ORAP analyst rather than more senior headquarters officials.

45. The AFOD has access to the same field-office systems, operational guidance, and policy materials relevant to the request as the FOD. Since Plaintiff sought policies and guidance—not personal deliberations unique to a FOD—it was reasonable to task an official with direct access to the relevant records systems.  Additionally, after the Miami AFOD completed his search, ICE agency counsel contacted an ERO Unit Chief for Regional Field operations.  The Unit Chief confirmed there were no additional guidelines specific to the location referenced in the second FOIA request.  Pineiro Decl. at ¶ 77.

46. Similarly, within ORAP, the search was directed to the official responsible for locating and accessing responsive policy materials.  Plaintiff's requests seek formal guidance and operative directives, it was reasonable to begin with the personnel responsible for maintaining and retrieving those records.

47. Plaintiff requested issued policies and operative guidance—not policy proposals or internal deliberations. If such records existed, they would ordinarily be maintained in shared systems and official program repositories rather than solely within personal files of senior leadership.

8

**ICE USED SEARCH TERMS AND SEARCH METHODS REASONABLY CALCULATED TO LOCATE RESPONSIVE RECORDS**

*Search Terms Were Based on How Each Office Maintains Records*

48. ICE did not use a single universal list of search terms across all offices because each offices organizes and stores records in their own unique organizational system. ICE tailored search terms to the organizational practices of each office, maximizing the likelihood of locating responsive records. This approach is consistent with FOIA best practices and ensures that records are not missed due to rigid or inappropriate search term selection.

49. Each custodian selected search terms based on that custodian's knowledge of how records are stored, titled, and retrieved within that office.

50. Custody Management searched using terms including "detainee," "transfer," "detainee policy," "transfer policy," and "admission and release."

51. Field Operations searched using terms including "operative version of manuals," "operative versions of memoranda," "placement guidelines," "transfer directive," "transfer," and "placement."

52. The Removal Division searched using terms including "placement guidelines," "transfers," and "intake forms."

53. ORAP searched using terms including "GMOC", "Guantanamo," and "high profile," because those terms directly reflected the examples identified by Plaintiff.

54. The use of different search terms across offices reflects differences in how those offices maintain records and how different custodians organize files, not a defect in the search. Each custodian is best placed to decide which search terms are most likely to identify records responsive to a FOIA request based on that custodian or that office's organizational methodology.

*ICE Addressed Both Placement and Transfer*

55. ICE did not construe the requests as limited to inter-AOR transfers. The first FOIA request expressly sought records concerning initial processing, initial placement, and any

subsequent transfer of individuals in ICE custody. ICE's searches targeted records pertaining to guidance on both initial placement and subsequent transfers, as well as intake materials and operational instructions. Any perceived focus on transfers reflects the nature of the records maintained, not a limitation in the search.

56. Custody Management searched for admission-and-release records and detention policy materials. Field Operations searched placement guidance, manuals, memoranda, and transfer directives. Removal Division searched for intake forms, placement guidance, and transfer-related records. ICE also searched for intake materials identified in the request itself, including questionnaire guides and case action worksheets.

57. ICE's searches therefore included intake, admission and release, placement guidance, and field operational materials governing both initial placement and later movement within detention operations.

58. Although Plaintiff received more records pertaining to transfers in the productions, ICE used search terms reasonably calculated to locate both transfer and placement related records. Pl's Mot. For Summ. J. at 23.

*ICE Searched by Subject Matter Rather Than Exact Titles*

59. Plaintiff points to specific documents titles and form names—such as the Initial Placement Questionnaire, Juvenile Action Worksheet, the Guantanamo MOU, Directive 6000, Directive 24002, and similar examples.

60. The requests sought categories of operative guidance concerning placement and transfer decisions, not a fixed list of known file names.

61. Records may be maintained under different titles, abbreviated names, local naming conventions, or broader subject-matter labels. Responsive guidance is also maintained across operational memoranda, intake materials, transfer guidance, and office-specific instructions rather than in a single standalone placement directive.

62. For that reason, custodians searched by subject matter—placement, transfer, intake, guidance, admission and release, and related operational terms—rather than assuming in advance the precise title under which a particular document might be stored.

63. Plaintiff identifies the Detainee Transfers Checklist as an example of a record ICE allegedly failed to locate or produce. That document was, however, included in ICE's June 2025 supplemental production at Bates Nos. 000155 through 000157.

*ICE Does Not Maintain a Single Uniform Nationwide Initial Placement Directive*

64. Plaintiff argues that it is implausible that ICE would not maintain written guidance relevant to how officers determine where individuals are initially trained. ICE does not maintain a single uniform nationwide directive that prescribes initial placement decisions for all detainees in all circumstances.

65. Initial placement decisions are operational determinations made in real time based on multiple variables, including, for example, facility availability, bed space, security classification, gender, medical and mental health considerations, and other requirements affecting special populations. Because those factors vary from case to case and often change based on current operational conditions, placement decisions depend on contemporaneous operational judgment rather than fixed written rules that could uniformly direct placement outcomes in every circumstance.

*Location-Specific Terms Were Not Required for the Initial Search*

66. The first FOIA request sought operative guidance governing placement and transfer decisions generally. ICE therefore searched using broader operational terms directed to the subject matter of the request rather than beginning with location-specific examples.

67. If guidance concerning the examples listed in the second FOIA request, such as transfers to Guantanamo, southern facilities, or other specific locations, existed as part of ICE's broader placement-and-transfer framework, those broader operational terms would be the terms also most likely to identify the records responsive the second FOIA request. When Plaintiff later emphasized Guantanamo, GMOC, and high-profile examples, ICE also conducted targeted follow-up review using those more specific terms.

11

*Each Office Searched the Systems It Actually Uses*

68. ICE directed each office to search the systems that office uses and relied on the official most familiar with those systems.

69. Depending on the office, those searches included desktops, hard drives, shared drives, Outlook accounts, the ERO Insight Database, the ICE Intranet system and other office-specific repositories.

70. Because records are not maintained the same way across ICE components, each office searched the locations where responsive records were most likely to be found based on its own operations and recordkeeping practices.

## CLAIM 2 – PROACTIVE DISCLOSURE / FOIA LIBRARY RECORDS

### ICE ALREADY PUBLICLY POSTS FORMAL TRANSFER AND DETENTION POLICIES

71. ICE publicly posts formal detention standards, transfer directives, and policy manuals through its FOIA Library and detention standards pages, including Directive 11022.1 ("Detainee Transfers"), national detention standards addressing detainee transfers such as PBNDS 2011 §7.4, and other detention-related policy materials.

72. These records reflect ICE's formal agency-wide detention and transfer policies.

### MANY OF THE RECORDS PLAINTIFF IDENTIFIES ARE OPERATIONAL MATERIALS DISTINCT FROM FORMAL PUBLISHED DIRECTIVES

73. Plaintiff identifies intake forms, questionnaires, transfer worksheets, screening forms, checklists, and similar materials—such as the Initial Placement Questionnaire, Juvenile Action Worksheet, and other intake and transfer-related documents—as records that should have been separately posted in the FOIA Library.  ICE posts formal national policy directives and detention standards in its FOIA Library. Operational records, intake forms, and case-processing tools are not required to be posted unless they constitute agency-wide policy or guidance. ICE's proactive disclosure practices are consistent with statutory requirements and agency policy.

12

74. Plaintiff also identifies IHSC orientation guidance, patient, care services policies, and screening forms.

75. Many of those materials are case-processing tools, intake records, transfer coordination documents, screening tools, implementation materials, or operational records rather than standalone national policy directives.

76. Responsive records concerning placement and transfer are often maintained across operational memoranda, intake materials, admission-and-release records, transfer guidance, detention standards, and office-level operational records rather than in a single separately issued national directive titled "placement policy".

77. The fact that a record is responsive to a FOIA request does not necessarily mean that the record exists as a separately published agency-wide policy document required for FOIA Library posting.

78. Plaintiff also references nationwide directives such as Directive 6000 and Directive 24002. ICE posts formal agency-wide directives and national policy guidance that are operative and appropriate for FOIA Library publication. Where such guidance is identified and maintained as a directive or policy record subject to proactive disclosure, it is published through ICE's ordinary administrative posting process. In some instances, internal review, updating, or administrative processing may result in a delay between issuance and public posting. To the extent additional operative national guidance exists concerning placement and transfer decisions and is appropriate for FOIA Library publication, ICE maintains such records for publication through that same process.

## RESPONSIVE RECORDS AND FOIA LIBRARY RECORDS ARE NOT THE SAME THING

79. ICE's FOIA Library includes formal detention standards, transfer directives, policy manuals, and other records appropriate for proactive publication, including Directive 11022.1 and national detention standards governing detainee transfers.

80. Many additional records requested by Plaintiff—such as intake materials, questionnaires, transfer coordination records, screening tools, and detention records are maintained across multiple offices and systems.

81. To the extent such records exist, they are often maintained as operational records used in detention processing and implementation rather than as standalone agency-wide directives or national staff manuals maintained for separate FOIA Library publication.

82. The fact that ICE searched for and produced additional operational records in response to a FOIA request does not by itself establish that those records existed as separately published national policy directives requiring independent FOIA Library posting.

## CLAIM 3 – ICE'S WITHHOLDINGS AND SEGREGABILITY

83. Plaintiff's withholding challenge is directed primarily at a single document referred to in Plaintiff's motion as "Discharge and Transfers." The record is the IHSC user guide that expressly states at Bates No. 000110: "This use guide serves as Discharge and Transfer Guide for eClinical Works (eCW) version 12."

84. ICE produced that document in part and applied limited redactions under Exemption 7(E).

85. ICE did not withhold general discharge policy, medical care standards, or the existence of discharge and transfer procedures. ICE released the non-exempt portions of the document.

86. The table of contents itself at Bates No. 00109 reflects the technical nature of the guide and includes heading such as "eCW Links," "Adding Patients to Discharge Console," and "Cleaning Up the Discharge Console."

87. The remaining portions consist primarily of screenshots from ICE's internal database, together with related technical instructions, system codes, and step-by-step navigation procedures used by authorized personnel when processing detainee discharges and transfers.

88. These materials depict the functionality, layout, data fields, and operational processes of ICE's internal systems rather than substantive detention and transfer policies.

### THE REDACTED MATERIAL CONCERNS INTERNAL ENFORCEMENT OPERATIONS, NOT GENERAL MEDICAL POLICY

89. The withheld portions do not concern medical judgment or healthcare policy. They concern the internal eClinical Works ("eCW") system used by authorized personnel to document,

process, and execute detainee discharge and transfer action within ICE detention operations.

90. As reflected in the document itself, the guide provides technical instructions regarding functions such as accessing eCW links, adding patients to the discharge console, updating transfer information, and managing discharge workflows within the system.

91. Disclosure would reveal the structure, functionality, data fields, and operational use of ICE's internal systems and would provide a roadmap to how personnel process detainee movement, manage custody transitions, and execute transfers within those systems.

## ICE CONDUCTED A RECORD-SPECIFIC SEGREGABILITY REVIEW

92.  A line-by-line review was conducted to determine whether any reasonably segregable non-exempt information could be released.

93. ICE released limited non-exempt information sufficient to identify the nature of the record, including the title of the document and table of contents.

94. The remaining portions of the IHSC Discharge and Transfer Guide consist primarily of screenshots from ICE's internal systems, together with related technical instructions, system codes, and step-by-step operational guidance concerning how authorized personnel process detainee discharges and transfers within those systems.

95. Because the exempt technical information is embedded through the substantive portions of the document, further segregation would either disclose the protected internal system functionality itself or would leave only isolated fragments without meaningful information value.

## DISCLOSURE OF OTHER IHSC POLICIES DOES NOT UNDERMINE THE REDACTIONS

96. ICE separately disclosed broader IHSC policy materials concerning discharge and transfer procedures,

97. Those materials address general policy and operational guidance. The IHSC Discharge and Transfer Guide contains technical instructions concerning how personnel execute those functions within ICE.

15

98. These are different records serving different functions.

99. The disclosure of broader policy materials does not change the nature of the internal system instructions contained in the IHSC Discharge and Transfer Guide.

100. ICE's treatment of the document reflected a record-specific review and a determination limited to the technical internal system instructions contained in that record.

## CLAIM 4 – TIMELINESS OF ICE'S PRODUCTION AND SUPPLEMENTAL REVIEW

101. Plaintiff also challenges the timing of ICE's production and suggests that ICE produced responsive records only after litigation pressure or only after Plaintiff identified specific examples of documents that should have been located earlier.

102. ICE did not intentionally delay responding to Plaintiff's request. The timing of the initial production reflected the ordinary administrative workload of the ICE FOIA Office, including a substantial FOIA backlog, the volume of pending litigation matters, and the need to conduct searches, consult with program offices, and review records for responsiveness and applicable exemptions before release.

103. As an example of that workload, as of April 21, 2026, the ICE FOIA Office was handling 221 active FOIA litigations, including 125 matters involving monthly rolling productions, while also processing approximately 13,415 open FOIA requests and addressing a backlog of approximately 10,511 FOIA requests. ICE's standard litigation processing rate for monthly rolling productions is approximately 500 pages or five minutes of media review per month, per case.

104. Plaintiff's requests also required coordination across multiple operational offices within Enforcement and Removal Operations ("ERO"), including headquarters and field-level components, as well as review of whether centrally maintained policy materials existed outside ERO. Processing therefore required coordination across multiple custodians, review of records maintained in different systems, consultations with program offices, and follow-up review whether additional examples or categories of records were later raised.

105. ICE made an initial production on March 25, 2025, and later supplemented that production on June 24, 2025. The later production reflected continued processing of the same requests—not a refusal to search for or produce responsive records.

106. After Plaintiff raised concerns regarding the initial production, ICE conducted additional review and supplemented its production where appropriate. Supplemental production following continued review reflects the ordinary progressing of FOIA processing for complex requests involving multiple offices and follow-up review.

107. For example, Plaintiff identifies the Detainee Transfer Checklist as a record ICE allegedly failed to produce, but that document was included in ICE's June 2025 supplemental production at Bates Nos. 000155 through 000157.

108. ICE's productions in this matter were made within that broader administrative and operational framework and reflected continued review of Plaintiff's request, rather than a failure or refusal to conduct a reasonable search.

## CLAIM 5 – EXPEDITED PROCESSING OF THE SECOND FOIA REQUEST

109. Plaintiff also challenges ICE's denial of expedited processing for the Second FOIA Request concerning recent placement and transfer directives, including records relating to high-profile arrests, transfers to southern detention facilities, and transfers to the Migrant Operations Center ("MOC") at Guantanamo Bay.

110. On April 4, 2025, Plaintiff submitted the Second FOIA request seeking directives, guidelines, procedures, and protocols concerning the placement and transfer of individuals in ICE custody from May 2, 2024 through the date of fulfillment, including records relating to high-profile arrests and transfers to Guantanamo Bay, and requested expedited processing.

111. At the time, ICE was already actively processing Plaintiff's First FOIA Request, which sought operative guidance concerning initial processing, detention placement, intake forms, and subsequent transfer decisions in ICE custody. ICE had already completed searches and made an initial production on March 25, 2025 in response to the First FOIA Request.

112. In support of expedited processing, Plaintiff cited media coverage, public reporting, and ongoing litigation concerning high-profile arrests, transfers to southern detention facilities, and transfers to the MOC at Guantanamo Bay, asserting that disclosure of ICE guidance concerning those issues was urgent and involved widespread public interest.

113. ICE reviewed the request and supporting certification and determined that, although Plaintiff identified public interest concerning immigration enforcement and detention transfers generally, it had not demonstrated sufficient facts establishing a particular urgency requiring expedited disclosure of the specific records requested. ICE also determined that the subject matter of the Second FOIA Request substantially overlapped with the broader placement-and-transfer guidance already being processed under the First FOIA Request.

114. By acknowledgement letter dated April 11, 2025, ICE denied expedited processing and informed Plaintiff that it had failed to demonstrate a particular urgency to inform the public about the government activity involved and that the submission was conclusory and did not present sufficient facts to justify expedited processing.

115. Plaintiff appealed the determination on May 5, 2025. ICE reviewed the appeal and, on June 4, 2025, affirmed the denial of expedited processing.

116. ICE nevertheless continued processing the Second FOIA Request through ordinary FOIA procedures and, on June 18, 2025, advised Plaintiff that the subject matter and time period of the Second FOIA Request were fully encompassed within the first FOIA Request and that responsive records had either already been produced or did not exist.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Signed this 23rd day of April 2026.



FERNANDO PINEIRO JR
Digitally signed by FERNANDO PINEIRO JR
Date: 2026.04.23 21:32:34 -04'00'

Fernando Pineiro, FOIA Director
Freedom of Information Act Office
U.S. Department of Homeland Security
U.S. Immigration and Customs Enforcement
500 12th Street, S.W., Stop 5009
Washington, DC 20536-5009